# Nos. 11-4915-ag (L) & 11-5094-ag (XAP)

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

**FLAT RATE MOVERS, LTD.**

**Petitioner/Cross-Respondent**

v.

**NATIONAL LABOR RELATIONS BOARD**

**Respondent/Cross-Petitioner**

_____

**ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD**

_____

**BRIEF FOR
THE NATIONAL LABOR RELATIONS BOARD**

_____

**ROBERT J. ENGLEHART**
*Supervisor Attorney*

**JEFFREY W. BURRITT**
*Attorney*

**National Labor Relations Board**
**1099 14th Street, N.W.**
**Washington, D.C. 20570**
**(202) 273-2978**
**(202) 273-2989**

**LAFE E. SOLOMON**
*Acting General Counsel*
**CELESTE J. MATTINA**
*Deputy General Counsel*
**JOHN H. FERGUSON**
*Associate General Counsel*
**LINDA DREEBEN**
*Deputy Associate General Counsel*

**National Labor Relations Board**

# TABLE OF CONTENTS

**Headings**                                                          **Page(s)**

Statement of jurisdiction ...................................................................................1

Statement of the issues ......................................................................................2

Statement of the case.........................................................................................3

Statement of facts..............................................................................................5

  I.  The Board's finding of facts...........................................................................5

     A. Background ........................................................................................5

     B. The union begins an organizing campaign and the company responds
        by questioning employees about their union sympathies, threatening
        employees with discharge and other unspecified reprisals, and
        discharging 40 permanent employees .........................................................7

  II.  The Board's conclusions and order...............................................................12

Summary of argument.......................................................................................13

Standard of review ...........................................................................................15

Argument..........................................................................................................17

  I.  Substantial evidence supports the Board's finding that the company
    violated Section 8(a)(1) of the act by unlawfully interrogating employees
    about their union sympathies and by threatening to discharge employees
    because of those sympathies ........................................................................17

  II.  Substantial evidence supports the Board's finding that the company
    violated Section 8(a)(3) and (1) of the Act by engaging in a mass discharge
    of its permanent moving employees to discourage employees from
    participating in union activities....................................................................23

# <u>TABLE OF CONTENTS</u>

**Headings – Cont'd**                                                    **Page(s)**

A.  An employer violates the Act by discharging employees in order
to discourage employee participation in union activities ....................23

B.  Substantial evidence supports the Board's findings that the
company terminated the moving employees to discourage union
activity......................................................................................26

    1.  The company's decision to discharge the employees was
unlawfully motivated...................................................26

    2.  The company failed to meet its burden of establishing that it
would have discharged the employees in the absence of
union activity ...............................................................29

C.  The Board acted within its discretion in finding that the separation
agreements signed by some discriminatees were not valid waivers
of claims arising under the Act............................................................33

Conclusion ....................................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*Abbey's Transportation Serivces, Inc. v. NLRB*,
837 F.2d 575 (2d Cir. 1988)................................................................ 15,24,27

*Alpo Petfoods, Inc. v. NLRB*,
126 F.3d 246 (4th Cir. 1997) ...............................................................25

*Amptech, Inc. v. NLRB*,
165 F. App'x 435 (6th Cir. 2006) ........................................................31

*Beverly California Corp. v. NLRB*,
253 F.3d 291 (7th Cir. 2001) ...............................................................36

*Birch Run Welding & Fabricating, Inc. v. NLRB*,
761 F.2d 1175 (6th Cir. 1985) .............................................................25

*Boehringer Ingeloheim Vetmedica, Inc.*,
350 NLRB 678 (2007) ................................................................... 21,22

*Bourne v. NLRB*,
332 F.2d 47 (2d Cir. 1964).................................................................17

*BP Amoco Chemical-Chocolate Bayou*,
351 NLRB 614 (2007) ................................................................... 33,36,37

*Cibao Meat Products, Inc. v. NLRB*,
547 F.3d 336 (2d Cir. 2008)...............................................................16

*Davis Supermarkets, Inc. v. NLRB*,
2 F.3d 1162 (D.C. Cir. 1993)..............................................................25

*Flat Rate Movers, Ltd.*,
357 NLRB No. 112, 2011 WL 5592863 (Nov. 16, 2011).....................................1

*Gaetano & Associates, Inc. v. NLRB*,
183 F. App'x 17 (2d Cir. 2006) ...........................................................27

## TABLE OF AUTHORITIES

**Cases-Cont'd**                                                        **Page(s)**

*Huck Store Fixture Co. v. NLRB,*
  327 F.3d 528 (7th Cir. 2003) ...........................................................32

*Hughes Christensen, Inc.,*
  317 NLRB 633 (1995), *enforcement denied on other grounds,*
  101 F.3d 28 (5th Cir. 1996) ...................................................... 34,37

*Independent Stave Co.,*
  287 NLRB 740 (1987) .................................................................34

*Laro Maintenance Corp. v. NLRB,*
  56 F.3d 224 (D.C. Cir. 1995) ......................................................25

*Majestic Molded Products, Inc. v. NLRB,*
  330 F.2d 603 (2d Cir. 1964) ................................................... 25,32

*Manhattan Crowne Plaza Town Park Hotel Corp.,*
  341 NLRB 619 (2004) .................................................................22

*Marlin-Rockwell Corp. v. NLRB,*
  116 F.2d 586 (2d Cir. 1941) .......................................................33

*Mini-Industries, Inc.,*
  255 NLRB 995 (1981) .................................................................29

*NLRB v. American Geri-Care, Inc.,*
  697 F.2d 56 (2d Cir. 1982) .................................................. 16,21,25

*NLRB v. Caval Tool Division,*
  262 F.3d 184 (2d Cir. 2001) .......................................................16

*NLRB v. Columbia University,*
  541 F.2d 922 (2d Cir. 1976) ................................................... 16, 21

*NLRB v. G & T Terminal Packaging Co.,*
  246 F.3d 103 (2d Cir. 2001) ................................................... 15,16

# TABLE OF AUTHORITIES

**Cases - Cont'd**                                               **Page(s)**

*NLRB v. Gissel Packing Co.*,
  395 U.S. 575 (1969)..................................................................22

*NLRB v. International Brotherhood of Electrical Workers, Local Union 112*,
  992 F.2d 990 (9th Cir. 1993) ...............................................36

*NLRB v. J. Coty Messenger Service, Inc.*,
  763 F.2d 92 (2d Cir. 1985)........................................... 17,19

*NLRB v. Joy Recovery Technology Corp.*,
  134 F.3d 1307 (7th Cir. 1998) ...........................................30

*NLRB v. Katz's Delicatessen of Houston Street, Inc.*,
  80 F.3d 755 (2d Cir. 1996)...................................................16

*NLRB v. Link-Belt Co.*,
  311 U.S. 584 (1941)..............................................................24

*NLRB v. Long Island Airport Limousine Service Corp.*,
  468 F.2d 292 (2d Cir. 1972)................................................24

*NLRB v. Matros Automated Electrical Construction Corp.*,
  366 F. App'x. 184 (2010) .....................................................24

*NLRB v. Midwest Hanger Co.*,
  474 F.2d 1155 (8th Cir. 1973) .................................... 31,32

*NLRB v. Rubin*,
  424 F.2d 748 (2d Cir. 1970)................................................27

*NLRB v. S.E. Nichols, Inc.*,
  862 F.2d 952 (2d Cir. 1988)........................................ 23,25

*NLRB v. Seawin, Inc.*,
  248 F.3d 551 (6th Cir. 2001) ..............................................33

## TABLE OF AUTHORITIES

**Cases - Cont'd**                                                          **Page(s)**

*NLRB v. Solboro Knitting Mills, Inc.*,
    572 F.2d 936 (2d Cir. 1978).................................................................19

*NLRB v. Special Touch Home Care Services, Inc.*,
    566 F.3d 292 (2d Cir. 2009)................................................................19

*NLRB v. Town & Country Electric, Inc.*,
    516 U.S. 85 (1995)............................................................................16

*NLRB v. Transportation Management Corp.*,
    462 U.S. 393 (1983)..................................................................23,24,25

*NLRB v. Yonkers Associates, 94 L.P.*,
    416 F.3d 119 (2d Cir. 2005)..........................................................34,36

*Office & Professional Employees International Union v. NLRB*,
    981 F.2d 76 (2d Cir. 1992)............................................................16,24

*Power, Inc. v. NLRB*,
    40 F.3d 409 (D.C. Cir. 1994)..............................................................32

*PPG Industries, Inc.*,
    351 NLRB 1049 (2007) ......................................................................21

*Reno Hilton Resorts v. NLRB*,
    196 F.3d 1275 (D.C. Cir. 1999)...........................................................30

*Retired Persons Pharmacy v. NLRB*,
    519 F.2d 486 (2d Cir. 1975)...............................................................17

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951)..........................................................................15

*Webco Industries, Inc. v. NLRB*,
    90 F. App'x 276 (10th Cir. 2003), *enforcing*,
    334 NLRB 608 (2001) ...................................................................34,36

# TABLE OF AUTHORITIES

**Cases - Cont'd**                                                    **Page(s)**

*Winkle Bus Co.*,
  347 NLRB 1203 (2006) ...................................................................2

*Wright Line, a Division of Wright Line, Inc.*,
  251 NLRB 1083 (1980), *enforced on other grounds*,
  662 F.2d 899 (1st Cir. 1981) ..................................................... 24,25

**Statutes:**                                                        **Page(s)**

National Labor Relations Act, as amended
  (29 U.S.C. § 151 et seq.)

Section 7 (29 U.S.C. § 157) ....................................................... 12,17
Section 8(a)(1) (29 U.S.C. § 158(a)(1))....................... 2,3,12,13,17,19,23
Section 8(a)(3) (29 U.S.C. § 158(a)(3))........................... 3,12,13,23,25
Section 10(a) (29 U.S.C. § 160(a)) ..................................................2
Section 10(e) (29 U.S.C. § 160(e)) ..............................................2,15
Section 10(f) (29 U.S.C. § 160(f)) ...................................................2
Section 10(j) (29 U.S.C. § 160(j))....................................................5

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

———————————————

### Nos. 11–4915–ag (L) & 11–5094–ag (XAP)

———————————————

### FLAT RATE MOVERS, LTD.

**Petitioner/Cross-Respondent**

**v.**

### NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

———————————————

## ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR
## ENFORCEMENT OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

———————————————

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

———————————————

## STATEMENT OF JURISDICTION

This case is before the Court on the petition of Flat Rate Movers, Ltd. ("the

Company") to review, and the cross-application of the National Labor Relations

Board ("the Board") to enforce, the Board's Order in *Flat Rate Movers, Ltd.*, 357

NLRB No. 112, 2011 WL 5592863 (Nov. 16, 2011).  (A 625-40.[1])  The Board had

jurisdiction over this matter under Section 10(a) of the National Labor Relations

Act (29 U.S.C. § 151, 160(a)) ("the Act"), which empowers the Board to prevent

unfair labor practices.

This Court has jurisdiction under Section 10(e) and (f) of the Act (29 U.S.C.

§ 160(e) and (f)), because the unfair labor practices were committed in New York.

The Board's Order is final with respect to all parties.  The Company filed its

petition for review on November 28, 2011, and the Board filed its cross-application

to enforce the Board's Order on December 9, 2011.  There is no time limit in the

Act for seeking enforcement or review of Board orders.

## STATEMENT OF THE ISSUES

1.    Threats and coercive interrogations of employees concerning their

union sympathies and activities violate Section 8(a)(1) of the Act (29 U.S.C.

§ 158(a)(1)).  Does substantial evidence support the Board's findings that the

Company unlawfully interrogated and threatened its employees when, between late

June and mid-July 2009, various company managers questioned employees about

whether they supported the Union and whether they had signed authorization

---

[1] A" refers to the joint appendix.  "Br." refers to the Company's opening brief.
References preceding a semicolon are to the Board's findings; those following are
to the supporting evidence.

cards, and support the Board's findings that the Company unlawfully threatened

employees for supporting the Union?

    2.      Discharging employees in order to discourage union activity violates

Section 8(a)(3) and (1) of the Act (29 U.S.C. § 158(a)(3) and (1)).  Does

substantial evidence support the Board's finding that the Company violated the Act

by discharging 40 permanent employees almost immediately after learning of the

union organizing campaign?

## STATEMENT OF THE CASE

    In late June 2009, immediately after learning that Local 116 of the Retail,

Wholesale and Department Store Union, UFCW ("the Union") began an

organizing drive seeking to represent the Company's moving employees, company

officials began interrogating employees about their union sympathies and activities

and threatening them with discharge and unspecified reprisals.  On July 7, the

Company made good on those threats and began discharging employees, and by

the end of July fired approximately 40 permanent employees.

    Acting on charges filed by the Union and several of the discharged

individuals, the Board's General Counsel issued a complaint alleging that the

Company unlawfully interrogated its employees about their union sympathies and

activities, threatened employees with job loss if they supported the Union, engaged

in surveillance of the employees' union activities, imposed more onerous working

conditions on certain crews based on antiunion considerations, and unlawfully

discharged employees in order to discourage its remaining employees from

supporting the Union or engaging in union activities protected by the Act.

Following a hearing, an administrative law judge issued a decision finding that the

Company violated the Act by interrogating and threatening a number of employees

and discharging approximately 40 permanent employees.[2]  The judge dismissed

the remaining allegations.  After the Company filed exceptions to the judge's

decision, the Board issued a Decision, Order, and Direction affirming, with

modifications, the judge's rulings, findings, and conclusions.

In a separate but related action commenced before the issuance of the

Board's Order, the Board's Regional Director sought an injunction from the United

States District Court for the Southern District of New York, pursuant to Section

10(j) of the Act (29 U.S.C. § 160(j)).  On July 12, 2010,[3] the district court issued

the temporary injunction pending final disposition of the case by the Board,

---

[2] The hearing was a consolidated proceeding addressing the unfair labor practice
charges as well as objections and eligibility challenges filed by the parties
following a representation election involving the Company's employees.  The
Board, in turn, addressed those objections and challenges, severed the
representation case (Board Case No. 2–RC–23399), and remanded it to the Board's
Regional Director for further processing.  In its petition for review, the Company
asked the Court to review those findings, but in a January 3, 2012 Order, the Court
dismissed those allegations for lack of jurisdiction.

[3] In its decision (A 632 n.11), the Board mistakenly states that the court issued the
injunction on July 10.

enjoining and restraining the Company from, among other unlawful acts, discharging, interrogating and threatening employees for engaging in union activities, and ordering the Company to reinstate those discharged employees who wanted to return to the Company.  (A 632 n.11.)

## STATEMENT OF FACTS

## I.     THE BOARD'S FINDINGS OF FACT

### A.     Background

The Company, formed in 2001, provides moving services for commercial and residential customers from a terminal in the Bronx, where approximately 230 employees are directly engaged in moving operations.  (A 628; A 20 p 141, A 614-19.)  After booking a moving job, the Company assigns a crew to complete the move, usually consisting of a foreman, a second foreman, a driver, and a helper.  (A 629; A 21 p 145.)  Until July 2009, the Company paid employees solely on a commission basis, with each crew sharing 27 percent of the total price of the move, divided based on each crew member's position.  (A 629; A 24 p 156, A 142 p 1095.)[4]  Accordingly, when the Company lacked sufficient work for all of its

---

[4] Around July 2009, as a result of an investigation by the New York Attorney General's office, the Company modified its pay structure to conform to New York's minimum wage and overtime laws so that employees would be paid the greater of the commission rate or the minimum hourly and overtime rate.  (A 629; A 137-38 pp 1052-53, A 143 p 1097.)

employees, those not assigned to work were not paid.  (A 629; A 22 pp 149-50, A 87-88 pp 737-38.)

The Company's business is seasonal, with the busy season lasting from May through September.  (A 629; A 22 p 148, A 86 p 723, A 123 p 958.)  During the busy season, in addition to its ordinary complement of workers, the Company hires foreign students who enter the United States under a work study program.  (A 629; A 22 p 148, A 30 pp 185-86.)  Those employees, who are terminable at will and without risk of penalty to the Company, are paid at the same rate and work under basically the same terms and conditions as the Company's permanent employees.  (A 630, 631; A 129 pp 1005-07, A 253-60.)

In October 2008, due to a decline in business, the Company reduced the salaries of its managerial and administrative employees by up to 10 percent.  (A 629; A 87 p 735.)  It did not reduce the commissions earned by its moving crews, but instead reduced its prices to increase its sales volume and keep the crews busy and intact until business picked up.  (A 630, 633; A 106 p 882.)

In Spring 2009, despite the decline in business, the Company began extending employment offers to foreign students for that summer.  It ultimately hired approximately 63 foreign students, including 18 in June, and 1 in July.  (A 630; A 620-24.)

**B.    The Union Begins an Organizing Campaign and the Company Responds by Questioning Employees About Their Union Sympathies, Threatening Employees with Discharge and Other Unspecified Reprisals, and Discharging 40 Permanent Employees**

In May 2009, the Union began a campaign to organize the Company's moving employees.  (A 629; A 12 pp 49-52, A 35 p 260.)  Employees Daniel Torres, Alejandro Farciert, and Nelson Rodriguez distributed authorization cards to their coworkers in May and June 2009 in and around the Company's facility. (A 629; A 35 p 261, A 51 p 401, A 66 p 580.)  From about June 21 on, Union Business Agent Luis Rodriguez stood in front of the Company's facility every morning, where he spoke to passing employees about the benefits of the Union and encouraged them to sign authorization cards.  (A 629-30; A 13 p 56, A 35-36 pp 263-64.)  The Company became aware of the Union's organizing campaign no later than June 24.  (A 630; A 24 p 157.)

On or about June 25 or 26, manager Gilead Zukin asked employee Miguel Lerbu Felix[5] if he supported the Union and stated that Lerbu Felix had to tell him if his preference was for the Company or for the Union.  (A 634; A 82 pp 703-04.) On June 26, 2009, manager Tony Pabon told employee Edwin Guevara "don't

---

[5] Miguel Lerbu Felix ("Lerbu Felix") testified at the hearing about the June 25 or 26 interrogation and about being discharged on July 10.  (A 81-82 pp 701-05.)  He is mistakenly referred to in the Decision and Order as Miguel Lerbu or Miguel Felix Lerbu.  Separately, the Company also discharged Miguel Angel Lerbu on July 9, who did not testify at the hearing.

associate with the union and don't get involved with the union." (A 634; A 58

p 515.) And between approximately June 28 and June 30, Pabon asked employee

Daniel Torres whether or not he had signed an authorization card. Although he

had signed a card, Torres said that he had not, to which Pabon responded "because

you know what's going to happen to you if you sign that card." (A 634; A 14 p 64,

A 36-37 pp 266-68, A 414-15.)

Around July 3, the Company's owners decided to discharge 40 of its

permanent moving department employees and to retain all of the approximately 63

foreign students it had hired for the summer. (A 631; A 25-26 pp 162-64, A 91-92

pp 751-54, A 122-23 pp 954-56, A 130 p 1009, A 263-65.) That same day, the

Company posted a "[d]ownsizing" memo informing employees of the discharge

decision but not naming which employees would be discharged. (A 631; A 25 pp

160-61, A 399-400.) Over the next few days, Company officials met to discuss

who would be discharged. (A 631; A 99 pp 832-33.) Between July 3 and July 6,

the Company also asked its moving employees to sign a "non-disclosure

agreement" designed to prevent employees from disclosing information, including

salaries and skills, to anyone outside the Company. (A 632; A 26-27 pp 167-68, A

27 p 171, A 31-32 pp 219-20, A 405-06.)

On July 6, the Company learned that the Union had filed a representation petition with the Board earlier that day.  (A 630; A 15 p 68, A 26 p 166, A 359-361.)

On or about July 6, manager Prezemyslaw Chomicz asked employee Franklyn Delahoz if he was part of the Union and if he had signed an authorization card.  (A 634; A 45 pp 324-25.)  The Company discharged Delahoz on July 7. (A 634, 637; A 46 p 326.)

On or about July 8, while employee Jesus Diaz was waiting to meet with management officials, Pabon asked him do "you want to be with the Company or the Union?"  (A 634; A 73 p 629.)  The Company discharged Diaz that same day. (A 634, 638; A 74 pp 630-31.)

On July 8, while employee Humberto Matos was meeting with Rosado and Pabon, Pabon asked if Matos was with the Company or with the Union.  The Company discharged Matos during that meeting.  (A 634, 638; A 49 pp 362-63.)

On July 10, company officials called Nelson Rodriguez into a meeting. Before going into the meeting, he spoke with Pabon, who asked him about the Union.  When Rodriguez expressed his support for the Union, Pabon responded "Okay then, just go to Human Resources."  During that meeting, which Pabon attended, the Company discharged Rodriguez.  (A 634, 639; A 67 pp 582-85.)

Also on July 10, the Company called Lerbu Felix into a meeting with human resources where Human Resources Manager Jasmine Rosado stated "I'm going to be straight up and direct [with] you, what is it that you prefer, the union or your job?" Lerbu Felix responded by saying that he preferred his job but that he was going to continue to support the Union. Rosado replied by stating "[W]ell you're no longer going to work for this company." The Company immediately discharged him. (A 634, 638; A 82 p 705.)

The Company also discharged Torres on July 10. (A 634, 639; A 37 p 268, A 414-15.)

The Company discharged Guevara, effective July 15, 2009. (A 634, 637; A 58 pp 517-18.)

On July 17, Alejandro Farciert, who had been discharged on July 7, went to the facility to return a cell phone and some contracts. While there, Chomicz asked him why he had contacted and supported the Union. In the presence of Rosado, Chomicz said that Farciert "los[t] [his] job and [his] family will go hungry because of [his] support [for] the Union." (A 634, 639 & n.11; A 52 pp 424-25.)

Including the 8 employees discussed above, the Company discharged a total of 40 employees between July 7 and July 23. (A 632, 637-39; A 25 p 161, A 369-370 ¶ 14(a), A 382 ¶ 14(a).) The Company did not tell any of the employees that they might be recalled when business conditions improved. (A 631; A 144

p 1102.)  The Company had never previously laid off or discharged a group of employees.  (A 629; A 23 pp 154-55, A 85 p 727.)

The Company offered many of the discharged employees between $150 and $400 to sign a "Separation Agreement and General Release."  Approximately 15 employees accepted the payment and signed the agreement.  (A 632.[6])

The Board conducted a representation election on August 14.  (A 632.)  The outcome of the election was not immediately known because the Company and the Union challenged 95 ballots, an amount sufficient to affect the outcome.[7]  (A 632.)

In late September, the Company began to hire new moving employees, and by the end of October had hired 35 new employees.  (A 632; A 28-29 pp 179-81, A 407-10.)  With the exception of Frandy Cabrera, the Company did not rehire any of the employees who it had discharged in July.  (A 632; A 28 p 179.)

---

[6] The following employees signed separation agreements: Angel Bezares received $150 (A 284-85); Frandy Cabrera received $150 (A 344-45); Segundo Carchipula received $150 (A 289-90); Petar Draskovic received $150 (A 301-02); Anthony Fernandez received $150 (A 354-55); Arialdis Ficco received $150 (A 333-34); Warren Iglesias received $150 (A 348-49); Parns Knight received $200 (A 313-14); Rainiero Madera signed an agreement (A 338-39) but received no money for doing so; Emmanuel Martinez received $150 (A 280-81); Kalen Mendenhall received $150 (A 292-93); Rarpi Mojica-Division received $150 (A 324-25); James Morales received $150 (A 275-76); David Neciosup received $150 (A 446-47); Joel Ramirez received $150 (A 318-19); Daniel Torres received $400 (A 417-18); and Wanda Velez received $150 (A 305-06).

[7] The Board severed the representation case and remanded it to the Regional Director for further proceedings.  (A 626.)

## THE BOARD'S CONCLUSIONS AND ORDER

The Board found that the Company violated Section 8(a)(1) of the Act (29 U.S.C. § 158(a)(1)) by unlawfully interrogating employees about their union sympathies and activities and threatening employees with job loss in retaliation for their union activities. The Board also found that the Company violated Section 8(a)(3) and (1) of the Act (29 U.S.C. § 158(a)(3) and (1)) by discharging employees to discourage its workforce from supporting or engaging in union activities. Further, the Board found that the separation agreements signed by some of the discharged employees did not preclude the Board from granting a remedy to those employees.

The Board's Order requires the Company to cease and desist from interrogating employees about their union sympathies, threatening employees with job loss in retaliation for their union activities, discharging employees in order to discourage employees from joining, assisting, or supporting the Union or any other labor organization, and from, in any like or related manner, interfering with, restraining, or coercing its employees in the rights guaranteed to them by Section 7 of the Act (29 U.S.C. § 157). Affirmatively, the Board's Order requires the Company to offer the discharged employees full reinstatement; make the employees whole; remove from their records any reference to the Company's unlawful actions; upon request furnish payroll and other records to the Board

necessary to analyze the amount of backpay due to the employees; and post a remedial notice at the Company's facility in the Bronx and distribute the notice electronically if the Company customarily communicates with its employees by such means.

## SUMMARY OF ARGUMENT

Immediately upon learning of the union organizing drive in June 2009, the Company began questioning its moving employees about their union sympathies and threatening to discharge them for supporting the Union. For instance, various management officials asked employees whether they supported the Union and had signed authorization cards, and whether they preferred the Union or their jobs. Substantial evidence supports the Board's findings that, in light of the surrounding circumstances, through these actions the Company unlawfully interrogated and threatened its employees in violation of Section 8(a)(1) of the Act (29 U.S.C. § 158(a)(1)).

The Company made good on its threats by discharging 40 permanent moving employees in July 2009, in order to discourage union activity, in violation of Section 8(a)(3) and (1) of the Act (29 U.S.C. § 158(a)(3) and (1)). Utilizing the Board's burden-shifting analysis, the Board reasonably found that Company was unlawfully motivated by union activity when it engaged in this mass discharge. This finding is supported by the Company's knowledge of the union activity, the

timing of the discharge, which occurred almost immediately after the Company learned of the Union campaign, as well as the Company's expressed hostility towards the Union. While the Company sought to justify its decision based on a decline in business, the Company had not rid itself of employees since its formation in 2001 and, throughout the decline that started in October of 2008, it had adopted price-cutting techniques to keep the volume of work up and avoid separating employees. All that changed when the Union arrived and the Company suddenly abandoned those price-cutting techniques. In addition, the fact that the Company then chose to sacrifice permanent, rather than temporary seasonal employees, was also telling. Finally, there was no legitimate explanation for why the Company chose to discharge, as opposed to lay off, these permanent employees and then, within three months, hire a new complement of employees numbering roughly the same as those discharged. It is no accident that the decision to discharge, as opposed to merely laying off employees, also ensured that the separated employees could not claim a right to vote in the union election. These actions all confirm the fact that the Company used this mass discharge as a power play to undermine the union movement.

Finally, the Board acted within its discretion in finding that the employees who signed release agreements when they were discharged in exchange for payments of $150 to $400, did not waive their rights to participate in the Board

proceeding and obtain relief under the Act. The Board reasonably found that the agreements were not a valid release because of the paltry consideration provided to the employees, the Company's failure to translate the agreement into Spanish for its largely Spanish-speaking group of employees, and the failure to provide a reasonable revocation period.

## STANDARD OF REVIEW

The Board's findings of fact are conclusive if supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *accord NLRB v. G & T Terminal Packaging Co.*, 246 F.3d 103, 114 (2d Cir. 2001). Evidence is substantial when "a reasonable mind might accept [it] as adequate to support a conclusion." *Universal Camera*, 340 U.S. at 477; *accord G & T Terminal Packaging*, 246 F.3d at 114. The Board's reasonable factual inferences may not be displaced on review even though the Court might justifiably have reached a different conclusion had the matter been before it *de novo*; as this Court has explained, "[w]here competing inferences exist, we defer to the conclusions of the Board." *Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575, 582 (2d Cir. 1988). In other words, this Court will reverse the Board based on a factual determination–such as a determination of employer motive–only if it is "left with the impression that no rational trier of fact could reach the conclusion drawn by the Board." *G &*

*T Terminal Packaging*, 246 F.3d at 114 (quoting *NLRB v. Katz's Delicatessen of Houston St., Inc.*, 80 F.3d 755, 763 (2d Cir. 1996)).  Moreover, this Court has long had a policy of deferring to the Board's adoption of the administrative law judge's credibility determinations, which "will not be overturned unless they are hopelessly incredible or they flatly contradict either the law of nature or undisputed documentary testimony."  *NLRB v. American Geri-Care, Inc.*, 697 F.2d 56, 60 (2d Cir. 1982) (quoting *NLRB v. Columbia Univ.*, 541 F.2d 922, 928 (2d Cir. 1976) (internal quotation marks omitted)).

The Court's review of the Board's legal conclusions is deferential: "This court reviews the Board's legal conclusions to ensure that they have a reasonable basis in law.  In so doing, the Court affords the Board 'a degree of legal leeway.'" *NLRB v. Caval Tool Div.*, 262 F.3d 184, 188 (2d Cir. 2001) (quoting *NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 89-90 (1995)); *see also Office & Prof'l Employees Int'l Union v. NLRB*, 981 F.2d 76, 81 (2d Cir. 1992) ("Congress charged the Board with the duty of interpreting the Act and delineating its scope."). Therefore, the Court will only reverse the Board's legal determinations if they are arbitrary and capricious.  *Cibao Meat Prods., Inc. v. NLRB*, 547 F.3d 336, 339 (2d Cir. 2008).

## ARGUMENT

## I. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT THE COMPANY VIOLATED SECTION 8(a)(1) OF THE ACT BY UNLAWFULLY INTERROGATING EMPLOYEES ABOUT THEIR UNION SYMPATHIES AND BY THREATENING TO DISCHAGE EMPLOYEES BECAUSE OF THOSE SYMPATHIES

Section 7 of the Act (29 U.S.C. § 157) guarantees employees "the right to self-organization, to form, join or assist labor organizations, . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." Section 8(a)(1) of the Act (29 U.S.C. § 158(a)(1)) implements these guarantees by making it an unfair labor practice for an employer to "interfere with, restrain, or coerce, employees in the exercise of rights guaranteed in [S]ection 7." An employer violates Section 8(a)(1) by interrogating its employees about their union sympathies if the interrogation is coercive in light of the surrounding circumstances. *See, e.g.*, *Retired Persons Pharmacy v. NLRB*, 519 F.2d 486, 492 (2d Cir. 1975). Likewise, it is unlawful for an employer to threaten an employee with discharge for engaging in union activities. *See NLRB v. J. Coty Messenger Serv., Inc.*, 763 F.2d 92, 97-98 (2d Cir. 1985).

The totality of the circumstances, including those factors listed by this Court in *Bourne v. NLRB*, 332 F.2d 47 (2d Cir. 1964) (per curiam),[8] support the Board's

---

[8] Those factors include: 1) the history of the employer's hostility towards or discrimination against union supporters; 2) the nature of the information sought or (continued)

finding that the Company unlawfully interrogated its employees.  On June 25 or

26, manager Gilead Zukin asked Lerbu Felix if he supported the Union and stated

that Lerbu Felix had to tell him if his preference was for the Company or for the

Union.  And around June 29, manager Tony Pabon asked Torres whether or not he

signed an authorization card; Torres responded that he had not.  In the days and

weeks that followed, the Company continued to interrogate its employees.  For

instance, Pabon asked both Jesus Diaz and Humberto Matos whether they

supported the Company or the Union and Chomicz asked Franklyn Delahoz

whether he had signed an authorization card.

Through these interrogations, the Company established a pattern of hostility

toward the Union.  The coercive nature of these inquiries was heightened by the

fact that the Company asserted no valid reason why it asked employees whether

they supported the Union and signed authorization cards; these meetings occurred

during the height of the union campaign; and at least Torres felt compelled to

respond dishonestly to questioning from a management official, telling Pabon that

he had not signed an authorization card when he had.  It was thus reasonable, and

---

related; 3) the rank of the questioner in the employer's hierarchy; 4) the place and
manner of the interview; and 5) the truthfulness of the employee's reply.  This
Court has recognized that the *Bourne* factors are neither exhaustive, definitive, nor
determinative, and that the absence of any one of those factors does not exonerate
the employer.  *See Retired Persons Pharmacy*, 519 F.2d at 492.

consistent with cases decided by this Court, for the Board to find that the Company violated Section 8(a)(1) of the Act by unlawfully interrogating its employees. *See NLRB v. Solboro Knitting Mills, Inc.*, 572 F.2d 936, 939-40 (2d Cir. 1978) (unlawful to ask employees whether they wanted to join a union); *NLRB v. Special Touch Home Care Servs., Inc.*, 566 F.3d 292, 301 (2d Cir. 2009) (unlawful to question employee about whether she signed a union card).

Likewise, substantial evidence supported the Board's finding that the Company violated Section 8(a)(1) by threatening employees with discharge and unspecified reprisals. Around June 29, after Torres told Pabon that he had not signed an authorization card, Pabon threatened "because you know what's going to happen to you if you sign that card." And on July 10, Rosado told Lerbu Felix "I'm going to be straight up and direct [with] you, what is it that you prefer, the union or your job?" *See NLRB v. J. Coty Messenger Serv., Inc.*, 763 F.2d 92, 97-98 (2d Cir. 1985) (unlawful to threaten to discharge employee for engaging in union activities).

The Company insists (Br. 44) that there was "no logical reason" for it to interrogate or threaten employees during their discharge meetings. But as described above, a number of the unlawful interrogations and threats occurred days before the Company made its July 3 decision to discharge employees. Those

unlawful acts alone support enforcement of those portions of the Board's Order requiring the Company to cease and desist from such acts.

In any event, that the Company interrogated and/or threatened some employees on the same day it discharged them, and in one case after the fact, does not change the unlawful nature of those actions. As a threshold matter, the Board found (A 634) that the Company failed to establish that, before meeting with each employee, it had selected all of the employees who would be discharged. On July 10, for example, the Company called in Lerbu Felix for a meeting and Rosado candidly stated "I'm going to be straight up and direct [with] you, what is it that you prefer, the union or your job?" It was only after Lerbu Felix asserted that he would continue to support the Union that the Company discharged him. But even if the Company had decided to discharge a particular employee before interrogating or threatening him, that did not give the Company license to interrogate and threaten those employees, for they retained the right to engage in Section 7 activities free from company interference.

The Company also argues (Br. 45-46) that the Board should have credited Rosado's testimony, in which she denied making these statements, over the testimony of the employees, because she was no longer employed by the Company. But Rosado was not present when the Company interrogated and/or threatened employees prior to the discharge decision, and was only present for

several of the interrogations and threats made during the discharge meetings. And given that she personally interrogated and threatened Lerbu Felix, she can hardly be described as disinterested.

Moreover, the judge explained (A 634) that his findings about the statements made during these meetings turned on credibility, and that based on the totality of the circumstances and his observation of the demeanor of the witnesses, he credited the employees' accounts.[9] Unless this Court finds that the testimony of these eight discriminatees was "hopelessly incredible" or "flatly contradict[ed] either the law of nature or undisputed documentary testimony," the Board's credibility determinations should not be disturbed on review. *See NLRB v. American Geri-Care, Inc.*, 697 F.2d 56, 60 (2d Cir. 1982) (quoting *NLRB v. Columbia Univ.*, 541 F.2d 922, 928 (2d Cir. 1976)).

The Company's reliance (Br. 47) on *PPG Industries, Inc.*, 351 NLRB 1049 (2007), and *Boehringer Ingeloheim Vetmedica, Inc.*, 350 NLRB 678 (2007), is also unavailing. In *PPG Industries*, the Board explained that "[a]n employer's motive for questioning an employee, as well as whether an employer's coercion is successful or otherwise is not relevant." 351 NLRB at 1052. Accordingly, it does

---

[9] Although the judge expressly based his credibility determination, in part, on his observation of the witness's demeanor, inexplicably the Company asserts (Br. 46 n.26) that "the Judge did not credit or discredit the testimony of witnesses based on their demeanor."

not matter whether, as the Company contends (Br. 47), the Company's questioning "could not have been designed to coerce employees into refraining from exercising their rights under the Act." And *Boehringer* is simply inapplicable, for there the Board found that employees were not questioned about the extent of their union activity or support, and there was no allegation that the employer threatened any employee. 350 NLRB at 692.

Finally, the Company insists (Br. 46) that, even if it made the alleged statements, they "were nothing more than Flat Rate campaigning against the Union," and were thus permissible. But by asking employees whether they signed an authorization card or otherwise supported the Union, and by threatening an employee that "you know what's going to happen to you if you sign that card," and by asking another "what is it that you prefer, the union or your job," the Company went far beyond lawfully "communicat[ing] its general views about unionism." *Manhattan Crowne Plaza Town Park Hotel Corp.*, 341 NLRB 619, 619 (2004) (citing *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969)). The Company's statements stand in stark contrast to *Winkle Bus Co.*, 347 NLRB 1203, 1220 (2006), on which the Company relies (Br. 46), in which an employer merely told an employee that "in your case the union is not good for you."

II.     **SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT THE COMPANY VIOLATED SECTION 8(a)(3) AND (1) OF THE ACT BY ENGAGING IN A MASS DISCHARGE OF ITS PERMANENT MOVING EMPLOYEES TO DISCOURAGE EMPLOYEES FROM PARTICIPATING IN UNION ACTIVITIES**

A.     **An Employer Violates the Act by Discharging Employees in Order To Discourage Employee Participation in Union Activities**

Section 8(a)(3) of the Act (29 U.S.C. § 158(a)(3)) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."  An employer thus violates Section 8(a)(3) and (1) by discharging or taking other adverse employment actions against employees for engaging in union activity or to discourage such activity among other employees.[10]  *See NLRB v. Transp. Mgmt. Corp.,* 462 U.S. 393, 397-98 (1983).  In this case, substantial evidence supports the Board's finding that the Company engaged in the mass discharge of its moving employees in order to discourage union activity.

In assessing discriminatory discharge cases, the critical inquiry is whether the employer's actions were unlawfully motivated.  *See NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952, 957 (2d Cir. 1988).  To answer this question, the Board employs its

_____

[10] An employer action that violates Section 8(a)(3) also derivatively violates Section 8(a)(1).  *See Office & Prof'l Employees Int'l Union v. NLRB*, 981 F.2d 76, 81 n.4 (2d Cir. 1992).

analysis articulated in *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB

1083 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir. 1981), and

approved by the Supreme Court in *Transp. Mgmt. Corp.,* 462 U.S. at 403.  Under

the *Wright Line* framework, before the Board, the Board's General Counsel has the

burden of demonstrating that the employer had knowledge that employees were

engaged in activity protected by the Act, and that the employer was motivated to

take an adverse employment action based on its hostility toward that activity.  *See*

*Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575, 579 (2d Cir. 1988); *NLRB v.*

*Matros Automated Elec. Const. Corp.*, 366 F. App'x. 184, 187 (2010).  The Board

may infer unlawful motive from direct and circumstantial evidence.  *See NLRB v.*

*Link-Belt Co.*, 311 U.S. 584, 602 (1941); *Abbey's Transp. Servs., Inc.*, 837 F.2d at

579.  Among the factors supporting such an inference are the employer's

knowledge of the employees' union activity, the employer's hostility to the union,

the timing of the employer's action, and the implausibility of its asserted reason for

the adverse action.  *See Abbey's Transp. Servs., Inc.*, 837 F.2d at 579-82; *NLRB v.*

*Long Island Airport Limousine Serv. Corp.*, 468 F.2d 292, 295 (2d Cir. 1972).

Once the General Counsel satisfies that burden, the Board will find a violation of

the Act unless the employer shows, by a preponderance of the evidence, that it

would have taken the same action even in the absence of the protected union

activity.  *See Transp. Mgmt. Corp.,* 462 U.S. at 397-98, 401-03; *Wright Line*, 251 NLRB at 1089.

In cases involving the mass discharge of employees, the General Counsel need not establish a correlation between each discriminatee's union activity and his or her discharge in order to make out a violation of Section 8(a)(3), but can instead establish that the discharge was ordered to discourage union activity.  As this Court reasoned in *Majestic Molded Products,, Inc. v. NLRB*, 330 F.2d 603, 606 (2d Cir. 1964), "[a] power display in the form of a mass lay-off, where it is demonstrated that a significant motive and a desired effect were to 'discourage membership in any labor organization,' satisfies the requirements of Section 8(a)(3) to the letter even if some white sheep suffer along with the black."  *Accord Alpo Petfoods, Inc. v. NLRB,* 126 F.3d 246, 255 (4th Cir. 1997); *Davis Supermarkets, Inc.*, 2 F.3d at 1169; *Birch Run Welding & Fabricating, Inc. v. NLRB,* 761 F.2d 1175, 1180 (6th Cir. 1985).

On review, courts afford particularly deferential review to the Board's motive findings because "the Act vests primary responsibility in the Board to resolve these critical issues of fact."  *S.E. Nichols*, 862 F.2d at 956 (citing *NLRB v. American Geri-Care, Inc.,* 697 F.2d 56, 59-60 (2d Cir. 1982)); *see also Laro Maint. Corp. v. NLRB*, 56 F.3d 224, 229 (D.C. Cir. 1995) ("[d]rawing . . .

inferences from the evidence to assess an employer's . . . motive invokes the

expertise of the Board . . . .").

**B.  Substantial Evidence Supports the Board's Findings that the Company Terminated the Moving Employees To Discourage Union Activity**

### 1.  The Company's decision to discharge the employees was unlawfully motivated

Ample evidence supports the Board's finding (A 633) that the General

Counsel made out a "compelling" showing that the Company was unlawfully

motivated when it decided to engage in a mass discharge of its moving employees.

As an initial matter, the Company conceded (A 630 & Br. 11) that by June 24 it

learned that a union organizing campaign was underway.  In the days that

followed, the Company openly expressed its hostility toward union activities.  As

discussed above (Section I), the Company immediately began interrogating and

threatening a number of employees, essentially admitting that it was discharging

employees because of employees support for the Union.  For instance, around June

28 to 30, after Torres told Pabon that he had not signed an authorization card,

Pabon threatened "you know what's going to happen to you if you sign that card."

And on July 10, Rosado demanded that Lerbu Felix reveal whether he preferred

the union or his job, and Lerbu Felix declared his continuing support for the Union,

Rosado informed him "you're no longer going to work for this company," and

discharged him.  Likewise, by asking Jesus Diaz whether he supported the

Company or the Union, the Company made it abundantly clear that the two were mutually exclusive choices.

Circumstantial evidence also raised a reasonable inference of the Company's unlawful motive for the firings. The timing alone of the Company's decision to discharge a significant number of moving employees shortly after the first signs of overt union activity provides strong evidence that the Company's decision was unlawfully motivated. *See NLRB v. Rubin*, 424 F.2d 748, 750 (2d Cir. 1970) ("stunningly obvious" timing of layoffs, which took place within days of the employer learning about a union organizing campaign, supported inference layoffs were intended to have coercive anti-union effect); *Gaetano & Assocs., Inc. v. NLRB*, 183 F. App'x 17, 20 (2d Cir. 2006); *Abbey's Transp. Servs.*, 837 F.2d at 580. And the Board reasonably found (A 632) that the Company's efforts to obtain nondisclosure agreements from the employees, after it decided to discharge employees but before informing the employees who had been discharged, was additional evidence of its intention to keep the Union at bay.

The Company challenges (Br. 26) the Board's finding that it had knowledge of, and animus against, the union activity by arguing that co-owners Carmel and Ben-Harosh "effectively reached the final decision to layoff permanent workers" during a June 8 meeting, before learning of the union organizing campaign. In support, the Company relies heavily on a June 8 memorandum (A 403-04)

memorializing that meeting. But in that memorandum, the co-owners merely mention a "layoff" "scenario." The memorandum does not address whether the scenario would encompass permanent or seasonal employees. Likewise, the memorandum refers to layoffs, not permanent discharges. This led the Board to reasonably find (A 631) that the memorandum "clearly shows that no final decision had yet been made." Moreover, the testimony of Human Resource Manager Rosado (A 147 pp 126-27) and COO Sam Gholam (A 25-26 pp 163-64) supported the Board's finding (A 631), that the Company did not make the discharge decision until July 3, "almost immediately *after* the Company became aware of the Union's organizing activity."

The Company (Br. 21-24) asserts, however, that the Board's reasoning is flawed because the administrative law judge mistakenly stated that a memorandum memorializing the June 8 meeting was dated June 28. But, contrary to the Company's suggestion (Br. 22), the judge did not infer animus because of a misperceived proximity between the Union first arriving at the facility and the issuance of the memorandum. The judge inferred animus because of the proximity between the Union first arriving at the facility in late June and the decision to discharge, which was made on or about July 3. Finally, the Company erroneously argues (Br. 23) that the Board was obligated to correct the judge's "faulty analysis." But the Board acknowledged at the outset of its decision (A 625 n.1)

that the judge got the date of the June 8 memorandum wrong, then affirmed the

judge's findings, implicitly rejecting the Company's argument that this error

impacted the judge's analysis.

In short, the mass discharge was not, as the Company contends (Br. 28) a

"preplanned layoff." Although the Company had earlier considered the possible

need to reduce manpower through an unspecified number of layoffs, it took no

action until it learned of the union organizing campaign, at which time it did not

"merely execute[]" an earlier layoff plan (Br. 27), but instead chose to discharge 40

permanent employees, including at least 8 whom the Company had unlawfully

interrogated and/or threatened, while retaining recently-hired seasonal employees.

This is far different from the facts of *Mini-Industries, Inc.*, 255 NLRB 995 (1981),

on which the Company places particular emphasis (Br. 28, 29 & n.14), where,

weeks before it learned of a union organizing campaign involving its employees,

the employer had established a firm plan to close its production facility

immediately after a client visit, and implemented that plan without change.

### 2. The Company failed to meet its burden of establishing that it would have discharged the employees in the absence of union activity

The Company defends its decision to discharge 40 permanent employees by

claiming that it was necessitated by a decline in business. But, as the Board noted

(A 633), that decline started in October 2008 and, despite its continuation, two sets

of company actions raise suspicion about the alleged necessity of the Company's ultimate decision to discharge 40 permanent employees.

First, the Company, through its own self-interest, had shown a studied reluctance to discharge trained permanent employees. The Company had never laid off a group of employees since its formation in 2001. When the slowdown began in October of 2008, in order to retain an experienced and qualified workforce of moving employees (A 633), the Company offered customers reduced rates in order to "keep the guys busy" by maintaining its volume of business. The Company continued to use this approach, and continued to avoid any layoffs, until shortly after the union activity began (A 631), when it abandoned its reduced rate program and discharged permanent moving employees instead.[11]

Second, in April 2009, well into the slowdown, the Company nonetheless began hiring approximately 60 foreign students to work from May to September 2009. (A 253-60, 356-58.) Then, when the Company claims it had to downsize its workforce in July, instead of keeping the experienced permanent employees who it

---

[11] *See Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1283 (D.C. Cir. 1999) (timing of decision to contract out work suspicious when it came on the heels of heavy union activity because employer had long known the benefits that would come from contracting out but had chosen not to do so); *NLRB v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1314 (7th Cir. 1998) (closing of department based on asserted financial concerns suspicious where it came 4 weeks after the employer learned of union campaign and employer had maintained department unprofitably for significant period of time).

previously had so highly valued, it kept the temporary foreign students instead.[12]

This was despite the fact that the foreign students had at-will employment

contracts, which specified that they could be discharged or laid off at any time.

(A 633; A 253-60.)  And it was also despite the fact that the foreign students were

just as costly to keep as permanent employees, because the Company paid them

under the same commission-based structure as the permanent employees.

The suspicion raised by these two sets of company actions is irrefutably

confirmed by the Company's choice of discharging, rather than laying off, the

permanent workers who the Company historically had made efforts to retain.  As

the Eighth Circuit noted in a very similar case, the decision to use discharges, as

opposed to layoffs, was "inconsistent with both the reasonable needs of the

business and, more importantly, with the employer's past practice during slack

periods."  *NLRB v. Midwest Hanger Co.*, 474 F.2d 1155, 1159 (8th Cir. 1973).

The court emphasized that the "method selected [discharge instead of layoff] for

the reduction in force may in itself be evidence of discriminatory purpose when

considered in light of the surrounding circumstances."  *Id.*  The court then

---

[12] *See Amptech, Inc. v. NLRB*, 165 F. App'x 435, 439-41 (6th Cir. 2006)
(unpublished) (even if employer needed to layoff employees due to economic
necessity, court found that employer failed to establish either that it was necessary
to lay them off 1 week after learning of a union organizing drive or that it was
necessary to lay off permanent employees while retaining a number of temporary
employees).

concluded: "The [employer's] failure to preserve this group of experienced employees in combating normal attrition of workers, indicates a desire to permanently disassociate these employees for the [employer], a desire which would be consistent with an anti-union motivation in the terminations." *Id.*

As in several similar cases, the Company's argument that a decline in business motivated its decision to discharge 40 employees is further undercut by its decision to hire 35 new employees 2 to 3 months later, and only rehire 1 of the employee who had been discharged. In *Power, Inc. v. NLRB*, the court likewise found that an employer failed to establish that it was motivated to layoff a group of employees based on economic necessity, rather than union animus, where, less than a month later, it imported a group of British workers to perform the jobs of the laid-off employees. 40 F.3d 409, 418-19 (D.C. Cir. 1994). And in *Majestic Molded Products, Inc v. NLRB*, this Court explained that the employer's decision to hire new employees, rather than rehiring a group of laid-off employees from a closely-related business, contradicted the employer's argument that it laid off the employees due to a decline in business. 330 F.2d 603, 606 (2d Cir. 1964). *See also Huck Store Fixture Co. v. NLRB*, 327 F.3d 528 (7th Cir. 2003); *Midwest Hanger Co.*, 474 F.2d at 1159-60. Of course, by discharging the employees, as opposed to laying them off, the Company not only accomplished its objective of discouraging union activity, but it also kept them from claiming that they should

vote in the representation election because they had a reasonable expectation of being called back once the Company's business picked up. *See Marlin-Rockwell Corp. v. NLRB*, 116 F.2d 586, 588 (2d Cir. 1941); *NLRB v. Seawin, Inc.*, 248 F.3d 551, 555 (6th Cir. 2001).

### C. The Board Acted Within Its Discretion in Finding that the Separation Agreements Signed by Some Discriminatees Were Not Valid Waivers of Claims Arising Under the Act

The Company argues (Br. 38-42) that the Board erred by finding that the employees who signed the Company's "Separation Agreement and General Release" on the day the Company discharged them, in exchange for payments of $150-$400 (see note 6 above), did not waive their rights to obtain relief under the Act. The Board, however, acted well within its discretion by finding (A 633), based on its consideration of the circumstances surrounding the execution of the agreements, that the agreements were not valid waivers of the employees' statutory rights.

In *BP Amoco Chem.-Chocolate Bayou*, 351 NLRB 614, 615 (2007), the Board explained that it will only give affect to an agreement, in which a discriminatee waives the right to file or pursue a claim under the Act, if doing so would effectuate the purposes and policies of the Act. In assessing the validity of such agreements, the Board considers all of the surrounding circumstances, including but not limited to (1) whether the parties to the Board case agreed to be

bound to the agreement, and the position of the General Counsel regarding

settlement; (2) whether the settlement is reasonable in light of the violations

alleged, the litigation risks, and the stage of the litigation; (3) whether there was

any fraud, coercion, or duress by any party in reaching the settlement; and

(4) whether the respondent had a history of violating the Act or has previously

breached settlement agreements. *Id*. at 615.[13]  Determining whether or not to defer

to such agreements falls within the Board's undisputed discretion. *See NLRB v.

Yonkers Assocs., 94 L.P.*, 416 F.3d 119, 123 (2d Cir. 2005); *Webco Indus. v.

NLRB*, 90 F. App'x 276, 284 (10th Cir. 2003) (explaining court was "compelled"

to uphold Board's decision to invalidate agreement "by consideration of the

responsibility of the Board to effectuate the purposes of the Act, an exercise to

which [the court] accord[s] great deference") *enforcing*, 334 NLRB 608, 610-11

(2001).

Here, in exercising that discretion, the Board reasonably found that the

release agreements did not preclude the discriminatees from obtaining relief.  First,

the Board found it significant (A 632) that, although many of the employees spoke

---

[13] These factors speak in terms of settlement because they originated in a line of
cases assessing the validity of private, non-Board settlement agreements.
*See Independent Stave Co.,* 287 NLRB 740, 741 (1987).  The Board has since
found that the validity of separation or release agreements is governed by these
same standards.  *See Hughes Christensen Co.*, 317 NLRB 633, 634 (1995),
*enforcement denied on other grounds*, 101 F.3d 28 (5th Cir. 1996).

Spanish, and some could not speak or write in English, the Company did not

translate the release agreement into Spanish. (A 632; A 23 p 155, A 32 p 220, A

37 p 270, A 50 p 367, A 53 pp 427-28, A 77 p 662, A 83 pp 706-07.) By contrast,

the Company provided literature to its employees about the Union in response to

the organizing campaign that was translated into Spanish, and had its employees

sign nondisclosure agreements between July 3 and July 6 that were translated into

Spanish. (A 632; A 28 p 178, A 32 p 220-21, A 440-41.) Furthermore, the

agreements were written in legalese,[14] which posed a significant bar to the

employees, who the Board found (A 632) were unlikely to have ready access to

legal counsel. And the Company took no effort to explain the agreements to the

employees and did not give employees a reasonable period of time to revoke the

agreement once signed. Finally, the Board found (A 633) that the consideration

given to employees in exchange for this release—$150 to $400—was indeed

---

[14] For instance, paragraph 4 of the agreement provides:

In consideration of the promises contained in this Agreement, you agree:

a. On behalf of yourself and anyone claiming through you, irrevocably and unconditionally to release, acquit end forever discharge the Company and/or its parent corporation, subsidiaries, divisions, predecessors, successors and assigns, as well as their past and present officers, directors, employees, shareholders, trustees, joint ventures, partners, and anyone claiming through them (hereinafter collectively "Releases"), in their individual and/or corporate capacities, from any and all claims, liabilities, promises, actions, damages and the like, known or unknown, which you ever had against any of the Releases arising out of or relating to your employment with the Company and/or your termination with the Company.

"totally inadequate."

In addition, the General Counsel, and the Union as the charging party before the Board, did not sign on to the release agreements, but instead vigorously opposed applicability of those agreements before the Board. Under established Board precedent, such opposition provides "a powerful reason to disregard [a] settlement."[15] *Yonkers Assocs.*, 416 F.3d at 123 (quoting *Beverly Cal. Corp. v. NLRB,* 253 F.3d 291, 295 (7th Cir. 2001)); *see also NLRB v. Intl. Bhd. of Elec. Workers, Local Union 112*, 992 F.2d 990, 992-93 (9th Cir. 1993).

The Company suggests (Br. 40) that *BP Amoco* is "a case strikingly similar to this matter" that provides "strong support" for validating the release agreements. But the employer in *BP Amoco* took steps to ensure its employees understood the release agreements at issue there and offered considerable consideration. Specifically, the employer gave employees 45 days to decide whether to sign the agreement and 7 days to revoke it once it was signed, in exchange for "substantial" severance pay, which for one employee amounted to more than $49,000, as well as medical and education benefits. *BP Amoco*, 351 NLRB 614-15. And the employer

---

[15] The fact that the Union did not file charges with the Board until after the employees signed the release agreements does not change the fact that the agreement clearly was meant to foreclose employees' rights to obtain relief under claims that the Union might, and ultimately did, file with the Board. *See Webco Indus.*, 334 NLRB 608, 611 (2001).

set up off-site information meetings for affected employees where employer representatives reviewed the terms of the agreement in detail and encouraged employees to consult attorneys before signing the agreement. Moreover, the employer offered the agreements at a time when there was little union activity taking place, and the General Counsel conceded that the case against the employer was weak. Here, the employees were not told how much time they had to decide whether to sign the agreements, the agreement did not provide for a revocation period, and the Company did not review with the employees the terms of the agreement. And unlike in *BP Amoco*, the Company presented the agreements at the height of the Union's activities, the General Counsel never suggested that the case on which he ultimately prevailed was weak, and the payments made in consideration for the release were, as the Board characterized them, "totally inadequate." It was therefore reasonable for the Board to find (A 633) that the holding in *BP Amoco* was inapplicable here.

The Company's reliance (Br. 42) on *Hughes Christensen, Inc.*, 317 NLRB 633, 634 (1995), is also misplaced. There, the Board found a severance agreement valid in very different circumstances: the employer gave the alleged discriminatees 45 days to review the agreement and severance package and 7 days to revoke it; the employer advised the discriminatees to consult with an attorney; the unfair labor practice charges had been filed but dismissed by the Board; and the

severance agreements provided up to 12 weeks pay depending on an employee's length of employment.

Because the Company failed to take even the most basic step of translating the release into Spanish, did not explain its effect when presenting it to the employees, and offered a mere pittance as consideration, it cannot be said that giving effect to these releases would effectuate the purposes and policies of the Act. Accordingly, the Board acted well within its discretion in invalidating these releases.

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that the Court enter a judgment denying the Company's petition for review and enforcing the Board's Order in full.

s/ Robert J. Englehart
ROBERT J. ENGLEHART
*Supervisory Attorney*

s/ Jeffrey W. Burritt
JEFFREY W. BURRITT
*Attorney*
National Labor Relations Board
1099 14th Street, N.W.
Washington, D.C. 20570
(202) 273-2978
(202) 273-2989

LAFE E. SOLOMON
*Acting General Counsel*

CELESTE J. MATTINA
*Deputy General Counsel*

JOHN H. FERGUSON
*Associate General Counsel*

LINDA DREEBEN
*Deputy Associate General Counsel*
*National Labor Relations Board*

October 2012

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

| | |
|---|---|
| FLAT RATE MOVERS, LTD | * |
| | * |
| Petitioner/Cross-Respondent | * Nos. 11-4915-ag (L) |
| | *     11-5094-ag (XAP) |
| v. | * |
| | *  Board Case No. |
| NATIONAL LABOR RELATIONS BOARD | *  2-CA-39373 |
| | * |
| Respondent/Cross-Petitioner | * |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the Board

certifies that its brief contains 9,062 words of proportionally-spaced, 14-point type,

and the word processing system used was Microsoft Word 2007.

## COMPLIANCE WITH CONTENT AND VIRUS SCAN REQUIREMENTS

Board counsel certifies that the contents of the accompanying CD-ROM,

which contains a copy of the Board's brief, is identical to the hard copy of the

Board's brief filed with the Court and served on the petitioner/cross-respondent.

The Board counsel further certifies that the CD-ROM has been scanned for viruses

using Symantec Antivirus Corporate Edition, program version 11.0.7000.975.

According to that program, the CD-ROM is free of viruses.

s/ Linda Dreeben

Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1099 14th Street, NW
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 10th day of October, 2012

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

| | | |
|---|---|---|
| FLAT RATE MOVERS, LTD | * | |
| | * | |
| Petitioner/Cross-Respondent | * | Nos. 11-4915-ag (L) |
| | * | 11-5094-ag (XAP) |
| v. | * | |
| | * | Board Case No. |
| NATIONAL LABOR RELATIONS BOARD | * | 2-CA-39373 |
| | * | |
| Respondent/Cross-Petitioner | * | |

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

I further certify that the foregoing document was served on the Petitioner/Cross-Respondent's counsel, who is a registered CM/ECF system user.

s/ Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1099 14th Street, NW
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 10th day of October, 2012