# 11-4915-ag(L),
## 11-5094-ag(XAP)

# United States Court of Appeals
## for the
# Second Circuit

FLAT RATE MOVERS, LTD.,

*Petitioner-Cross-Respondent,*

– v. –

NATIONAL LABOR RELATIONS BOARD,

*Respondent-Cross-Petitioner.*

ON APPEAL FROM AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

## FINAL FORM REPLY BRIEF FOR PETITIONER-CROSS-RESPONDENT

LEWIS BRISBOIS BISGAARD & SMITH LLP
*Attorneys for Petitioner-Cross-Respondent*
77 Water Street, Suite 2100
New York, New York 10005
(212) 232-1300

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION .................................................................................................. 1

SUMMARY OF ARGUMENT .............................................................................. 1

    ARGUMENT ................................................................................................ 3

  POINT I

  FLAT RATE DECIDED TO DOWNSIZE PRIOR TO THE UNION
  CAMPAIGN ................................................................................................. 3

  POINT II

  FLAT RATE DID NOT INTERROGATE OR THREATEN
  EMPLOYEES ............................................................................................. 11

CONCLUSION ..................................................................................................... 13

# TABLE OF AUTHORITIES

Amptech, Inc. v. NLRB, 165 Fed. Appx. 435 (6th Cir. 2006) ................................. 7

E & L Plastics Corp., 305 N.L.R.B. 1119 (1992) .................................................. 12

Huck Store Fixture Co. v. NLRB, 327 F.3d 528 (7th Cir. 2003) ..................... 10, 11

Levitt v. Brooks, 669 F.3d 100 (2d Cir. 2012) ......................................................... 5

Majestic Molded Prods., Inc. v. NLRB, 330 F.2d 603, 607 (2d Cir. 1964) ............ 10

Mini-Industries, Inc., 255 NLRB 995 (1981) .................................................. 4, 6, 7

New England Health Care Employees Union, District
1199, SEIU, AFL-CIO v. NLRB., 448 F.3d 189 (2d Cir. 2006) ............................. 6

NLRB v. Midwest Hanger Co., 474 F.2d 1155 (8th Cir. 1973) ..................... 7, 8, 10

Nortel Networks Corp. Sec. Litig., 539 F.3d 129 (2d Cir. 2008) ............................. 5

Power, Inc. v. NLRB, 40 F.3d 409 (D.C. Cir. 1994) ..................................... 7, 8, 10

Reeves v. Sanderson Plumbing Prods., 530 U.S. 133 (2000) ........................... 12, 13

Singleton v. Wulff, 428 U.S. 106 (1976) .................................................................. 5

Wright Line, 251 N.L.R.B. 1083 (1980), enf'd 662 F.2d 899 (1st Cir. 1981) .......... 7

**TO THE HONORABLE UNITED STATES COURT OF APPEALS:**

## I. INTRODUCTION

Petitioner/Cross-Respondent Flat Rate Movers, Ltd. ("Flat Rate") submits this memorandum of law in further support of its Petition for Review of the November 16, 2011 order (the "Order") of the National Labor Relations Board (the "Board") and in opposition to Respondent/Cross-Petitioner National Labor Relations Board's Petition for Enforcement of the Order.

## II. SUMMARY OF ARGUMENT

The Board's decision in this matter must be reversed as its findings of fact are not supported by substantial evidence, and its legal conclusions lack a reasonable basis in the law. The Board adopted the ALJ's decision and held that Flat Rate violated several sections of the National Labor Relations Act by laying off 40 movers in July 2009, and allegedly threatening and interrogating employees during a union campaign. Any allegations of wrongdoing are misplaced and untrue.

Flat Rate laid off 40 full-time movers in July 2009 because of economic difficulties the company had encountered since October 2008. On May 18, 2009 and June 8, 2009 – before the commencement of the union campaign and after taking several steps to restore the viability of the company, including reducing the salaries of all its non-movers and management personnel and performing Economy Moves – Flat Rate management specifically discussed the financial struggles of the company and

determined that layoffs would be necessary at the conclusion of June 2009 barring a miraculous turn of events. In early July 2009, after analyzing the financial data from June and taking note of the sharp decline in income and profits, Flat Rate implemented the layoffs. There are no allegations that Flat Rate committed any unfair labor practices before learning of the Union campaign on June 24, 2009.

The General Counsel has provided no basis to find otherwise. Instead, the General Counsel seeks to confuse this Court with a series of arguments that skirt the main issue: whether Flat Rate decided to downsize in response to the Union campaign. Simply put, Flat Rate could not have harbored Union animus when it made the decision to implement layoffs on June 8, 2009, because it is undisputed that Flat Rate had no knowledge of the Union campaign on that date.

In addition, the Board erred in holding that Flat Rate threatened and interrogated employees. The testimony of Jasmine Rosado, the former Manager of Human Resources for Flat Rate and the only disinterested witness in this matter, establishes that Flat Rate did not question or threaten employees during their exit interviews, as there was no reason for Flat Rate to do so. The General Counsel did not cross-examine Ms. Rosado, and it cannot now discredit her testimony by citing to the testimony of admittedly biased witnesses.

III. ARGUMENT

POINT I

FLAT RATE DECIDED TO
DOWNSIZE PRIOR TO THE UNION CAMPAIGN

The Charging Parties do not dispute that, beginning in or around October 2008, the United States economy – and with it the housing market – dipped into a severe recession. In response, Flat Rate cut employee salaries and introduced lower cost moves – Economy Moves – in an effort to stabilize the company's bottom line. When these measures did not work, it is undisputed that on May 18, 2009, Israel Carmel and Sharone Ben-Harosh, two of Flat Rate's owners, discussed the possibility of laying off workers if Flat Rate's financial woes did not improve. (Deferred Joint Appendix ("Appendix") at 402). On June 8, 2009, after reviewing May's sales figures, Carmel and Ben-Harosh determined that layoffs were unavoidable[1]. (Appendix at 404). Critically, the Charging Parties admit that Flat Rate did not know of the Union campaign until June 24, 2009, well after the aforementioned discussions of May 18, 2009, and June 8, 2009.

---

[1] The Board tries to argue that Flat Rate admitted that this was the first time that it had conducted mass layoffs. However, the Board failed to take into account that during Flat Rate's existence, the economy had not faced a recession similar to the one it encountered in 2008. Of particular significance is the fact that the housing market – the sector of the economy Flat Rate services and is therefore concerned with – was booming until 2008.

The Charging Parties assert that the ultimate decision regarding the layoffs was made on July 3, 2009, "almost immediately *after* the Company became aware of the Union's organizing activity." (Charging Parties Br. at 28) (emphasis in original). In support of this assertion, the Charging Parties cite to the testimony of Rosado and Sam Gholam. (Charging Parties. Br. at 28). But Rosado and Gholam testified that the company selected *who* to downsize on or around July 3, 2009. (Appendix at 122-23, 148). Their testimony did not disturb the fact that the ultimate decision to downsize occurred before the company learned of the Union campaign.

This is a critical point, and one that the Charging Parties cannot overcome. Instead, the Charging Parties have argued that a "mass layoff" – as the Charging Parties have characterized it – is sufficient to carry their burden even without evidence that Flat Rate targeted specific employees. (Charging Parties' Br. at 25). In such circumstances, however, it is axiomatic that an employer could not have laid off workers to discourage support for the Union if it was not aware of the union campaign at the time it reached its decision. See Mini-Industries, Inc., 255 NLRB 995, 1004-05 (1981) (no violation of the Act where the employer set the wheels in motion to close its plant and discharge employees prior to learning of its employees' union activity). In this case, as discussed above and in Flat Rate's opening brief, on June 8, 2009, the wheels were in motion to downsize its workforce prior to Flat Rate having knowledge

of the Union Campaign. The Board can point to nothing in the record – because there is nothing – that contradicts this fact.

In an attempt to remedy their earlier failures, the Charging Parties seemingly list a number of employees who Flat Rate allegedly interrogated or threatened to establish that Flat Rate laid off these employees because of their Union support[2]. (Charging Parties' Br. at 26-27). However, the Charging Parties did not challenge Flat Rate's selection of employees in the proceedings below, and it cannot do so now – at the appellate level – for the first time. Levitt v. Brooks, 669 F.3d 100, 104 (2d Cir. 2012) (held that defendant forfeited arguments not raised with district court) (citation omitted); see Singleton v. Wulff, 428 U.S. 106, 120 (1976) ("[i]t is the general rule…that a federal appellate court does not consider an issue not passed upon below") (citation omitted)[3].

---

[2] The Board took this position despite subpoenaing and being provided with the personnel files for much of Flat Rate's workforce at the commencement of the hearing, and the Charging Parties have failed to produce any evidence demonstrating that Flat Rate targeted the individuals it laid off because of their support for the Union.

[3] In isolated circumstances – such as those where consideration of the arguments is necessary to avoid a "manifest injustice" – an appellate court may consider arguments raised for the first time at the appellate level. In Re Nortel Networks Corp. Sec. Litig., 539 F.3d 129, 133 (2d Cir. 2008) (quotation omitted). However, the Court made clear that a manifest injustice is not present where, as here, "those arguments were available to the [parties] below and they proffer no reason for their failure to raise the arguments below." Id. (quotations omitted).

Without opining on Flat Rate's selection of the individuals it laid off, the Judge determined that Flat Rate downsized in response to the commencement of the Union campaign. (Appendix at 631). In so deciding, the Judge explained that Carmel and Ben-Harosh reached the decision to lay off workers on June 28, 2009 – only four days after learning of the Union campaign. (Appendix at 631). The undisputed documentary evidence shows that Carmel and Ben-Harosh met on June 8, 2009, a date on which Carmel and Ben-Harosh could not have harbored union animus. (Appendix at 404).

The Board adopted the Judge's decision – and noted the Judge's mistake – but failed to grasp its ramifications, instead branding it a typographical error. (Decision and Order p. 1). The Board failed to conduct a new analysis – or in any way alter that of the Judge – as it must. See New England Health Care Employees Union, District 1199, SEIU, AFL-CIO v. NLRB., 448 F.3d 189, 194, 196 (2d Cir. 2006) (vacating Board decision where the Board "failed to acknowledge the natural and logical implications of the facts it credited and the analytic framework it adopted").

Without evidence that Flat Rate targeted specific employees because of their union support, the Board could only find that Flat Rate's actions ran afoul of the Act if it decided to lay off workers *after* the company learned of the union campaign, rather than carry out pre-determined layoffs. Mini-Industries, Inc., 255 NLRB at 1004-05 (no violation of the Act where the employer "set the wheels in motion" to close its

plant and discharge employees prior to learning of its employees' union activity). By correcting the date of the meeting between Carmel and Ben-Harosh from June 28, 2009 (after the commencement of the union campaign) to June 8, 2009 (two weeks prior to Flat Rate learning of the campaign) the Board stripped the Judge of the one reason for finding Flat Rate liable – the timing of its actions. Nonetheless, the Board adopted the Judge's decision without explaining its reasons for doing so and despite the fact that the Judge's analysis could not stand in light of the Board's corrections.

In their opening brief, the Charging Parties missed the point entirely. Their argument centered on whether Flat Rate discharged workers rather than laid them off. This is a distinction without a difference. Whether workers are laid off or discharged, a company violates the Act if it takes action *because of* the commencement of a union campaign. See generally, Wright Line, 251 N.L.R.B. 1083, 1089 (1980), enf'd 662 F.2d 899 (1st Cir. 1981).

In each of the cases cited by the Charging Parties, the employer discharged or laid off workers immediately *after* learning of a union campaign. See, e.g., Amptech, Inc. v. NLRB, 165 Fed. Appx. 435, 437-38 (6th Cir. 2006) (layoff occurred one week after company learned of union campaign); Power, Inc. v. NLRB, 40 F.3d 409, 415, 419 (D.C. Cir. 1994) (violation of Act where layoff occurred three months after company learned of union campaign, and less than one month later company hired employees to perform jobs of those employees it laid off); NLRB v. Midwest Hanger

Co., 474 F.2d 1155, 1157 (8th Cir. 1973) (employees discharged approximately two weeks after union campaign began). By contrast, in this case, Flat Rate made the decision to downsize on June 8, 2009, *before* the commencement of the Union campaign. (Appendix at 404). The Charging Parties have presented no evidence to support a finding otherwise and thus cannot demonstrate that Flat Rate harbored any Union animus when it reached the decision to downsize its workforce.

Knowing they are unable to challenge the legitimacy of Flat Rate's June 8, 2009 decision to downsize, the Charging Parties now seek to show the requisite union animus by referring to Flat Rate's employment decisions in October 2009. (Charging Parties' Br. at 32). Specifically, the Charging Parties question Flat Rate's non-discriminatory reason for downsizing – its decline in business – because Flat Rate hired 35 employees three months after its July 2009 downsize.

Flat Rate's decision to hire 35 employees in October 2009 was unrelated to its July 2009 downsize. Rather, Flat Rate hired the 35 employees referred to by Charging Parties to replace those workers who had left the company between July 2009 – after the downsize – and October 8, 2009[4]. (Appendix at 459-60). GC Exhibit 43 lists the

---

[4] This case again differs markedly from the cases cited by the Charging Parties. For example, in Power, the Court inferred a discriminatory intent because the company hired workers to replace the workers it had laid off less than one month prior. 40 F.3d at 418-19; see also Midwest Hanger Co., 474 F.2d at 1159 (company began hiring employees to replace laid off workers just days after layoffs). In this
(footnote continued)

4838-9632-3344.1                                8

minutes from Flat Rate's Board of Directors' October 8, 2009 meeting and lists the 29 employees who left the company (both voluntarily and involuntarily) since the July 2009 downsizing. On that date, the Board of Directors authorized Flat Rate to immediately hire "the personnel required to replace those employees listed [on the first page]". (Appendix at 460). Flat Rate did so, and hired the 35 employees in question.

Further, it is undisputed that Frandy Cabrera, one of the employees laid off in July 2009, was among the 35 employees rehired in October 2009. (Charging Parties' Br. at 32). The Charging Parties seemingly believe that it is an indictment against Flat Rate that more of the laid off movers were not among the 35 employees hired in October 2009. Rather, these facts serve to support Flat Rate's argument.

In October 2009, Flat Rate rehired Cabrera because he was the only mover downsized in July 2009 that applied for re-employment. Flat Rate did not receive applications from any of the other movers downsized in July 2009, and it was not obligated to rehire employees who were not seeking employment with the company. Flat Rate did not know whether the remaining downsized movers had obtained other jobs or were otherwise interested in re-employment with Flat Rate. For example, Edwin Guevara, one of the laid off employees, testified that he opted to go to school

---

case, Flat Rate hired workers not to replace those it laid off, but to replace workers that left Flat Rate after the July 2009 downsize.

4838-9632-3344.1                                9

after he temporarily left Flat Rate in January 2009 (Appendix at 59), and he may have chosen to continue that along that path after he lost his job in July 2009. Further, many of the laid off movers elected not to return to Flat Rate even when given the opportunity to do so after the Court granted the General Counsel's request for a 10(j) injunction in this case. For those that did return as a result of the 10(j) injunction, it was the first time Flat Rate had learned that those individuals wished to return to Flat Rate.

By contrast, in each of the cases cited by the Charging Parties, the courts found union animus because of the existence of factors not present here. In particular, many of these cases present evidence that the companies decided not to re-hire the laid off workers (in addition to filling the laid off positions, as discussed above). See, e.g., Power, 40 F.3d at 420 (laid off employee applied for job similar to work he had been doing previously, yet company refused to re-hire him and opted instead to hire two employees with no experience); Midwest Hanger Co., 474 F.2d at 1159 (company began hiring employees to replace laid off workers just days after layoffs and "ignored" laid off employees when hiring); Majestic Molded Prods., Inc. v. NLRB, 330 F.2d 603, 607 (2d Cir. 1964) (company *refused* to hire laid off employees in attempt to encourage membership in one union and discourage membership in other); see also Huck Store Fixture Co. v. NLRB, 327 F.3d 528, 534 (7th Cir. 2003) (company hired ten employees to work on a permanent basis "in the midst of its 20

percent workforce reduction" and just one day prior to firing 12 of its own employees).

Flat Rate cannot and should not be penalized for its October 2009 hiring of 35 movers, as it did so to replenish its losses post-dating the July 2009 downsize. The fact that Flat Rate rehired the only laid off employee who applied for reemployment with the company serves to support its position that it did not harbor animus towards those employees laid off in July 2009. For the Charging Parties to now suggest that Flat Rate should be held liable because other laid off employees had not applied for reemployment – many of whom opted not to return to Flat Rate even after the opportunity to do so – is disingenuous and simply unsupported by the record evidence in this matter.

## POINT II

## FLAT RATE DID NOT INTERROGATE OR THREATEN EMPLOYEES

The evidence does not support the conclusion that witnesses were asked about their union affiliations or threatened during their separation interviews with Jasmine Rosado, Flat Rate's former Manager of Human Resources. There was no logical reason for Flat Rate to interrogate or threaten its employees about their union affiliations *during* the separation interviews. As Rosado testified, by the time the employees were ordered to go to Human Resources for their separation interviews, Flat Rate had already made the final layoff decisions concerning these employees.

(Appendix at 149). There is no evidence in the record that Flat Rate opted to retain any individual with whom it had scheduled a separation interview. Rosado also testified that she did not mention the Union or its campaign during any of the exit interviews, and she informed each of the employees that the company was downsizing due to its financial troubles[5]. (Appendix at 149-50). The Judge recognized the importance of Rosado's testimony in these areas, and the parties were prepared to enforce the subpoena served on Rosado before she agreed to appear voluntarily. (Appendix at 114, 204-05).

Critically, Rosado was the only disinterested witness to testify in this matter. Rosado left Flat Rate in November 2009 and no longer works for the company. (Appendix at 147). Consequently, as a matter of law, the Board should have credited her testimony. See E & L Plastics Corp., 305 N.L.R.B. 1119, 1124 (1992) (judge noted that independent witness had nothing to gain and credited his testimony); see also Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 151 (2000) (court "should give credence" to the testimony of disinterested witnesses).

Notably, the Charging Parties did not cross-examine Rosado during the hearing despite giving the opportunity to do so. In fact, they do not directly challenge the veracity of Rosado's testimony in their opening papers. Rather, the Charging Parties

---

[5] Rosado's testimony on this point is echoed by many of the Charging Parties' own witnesses. (Flat Rate Opening Br. at 9-10).

cite to the testimony of Miguel Felix Lerbu in an attempt to contradict Rosado's testimony. (Charging Parties Br. at 26). Lerbu, one of the 40 movers laid off in July 2009, is necessarily a biased witness. The Charging Parties should not be able to disprove the testimony of a disinterested witness with that of a witness admittedly interested in the outcome of the hearing. See Reeves, 530 U.S. at 151.

## CONCLUSION

Based on the foregoing, Flat Rate respectfully requests that this Court reverse the Board on the issues set forth above and in its initial papers and hold that Flat Rate acted in accordance with and pursuant to its rights under the National Labor Relations Act. Accordingly, Flat Rate also requests that the Court deny the Board's Petition for Enforcement of its November 16, 2011 order.

Dated: New York, New York
      October 11, 2012

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By: /s/ Ivan D. Smith
Ivan D. Smith, Esq.
Attorneys for Petitioner/Cross-Respondent
Flat Rate Movers, Ltd.
77 Water Street, 21st Floor
New York, New York 10005
212-232-1300

## CERTIFICATE OF COMPLIANCE

I, Ivan D. Smith, attorney of record for Petitioner/Cross-Respondent Flat Rate Movers, Ltd., do hereby certify that the foregoing brief complies with the type-volume limitation as set forth in FRAP 32(a)(7). The total number of words in the forgoing brief is 2,940.



/s/ Ivan D. Smith<br>Ivan D. Smith, Esq.